# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| WALLAKE POWER SYSTEM, LLC | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | JUDGE: |
| | ) | |
| vs. | ) | |
| | ) | |
| ENGINE DISTRIBUTORS, INC., | ) | |
| | ) | **COMPLAINT** |
| and | ) | |
| | ) | (*Jury Demand Endorsed Hereon*) |
| JERRY KOSNER, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Wallake Power System LLC, d/b/a Graham Power Products, d/b/a Graham Ford, Inc. ("**Graham Ford**") states as follows for its Complaint against Defendants Engine Distributors, Inc. ("**EDI**") and Jerry Kosner ("**Kosner**"):

## PARTIES

1. Graham Ford is a limited liability company organized under the laws of the State of Ohio, with its principal place of business in Columbus, Franklin County, Ohio.

2. EDI is a corporation organized under the laws of the State of New Jersey, with its principal place of business in Blackwood, Camden County, New Jersey.

3. Kosner is an individual residing in, upon information and belief, the State of Illinois. Upon information and belief, at all material times with respect to the allegations in this Complaint, Kosner was employed by, contracted with, and/or an agent of EDI.

## JURISDICTION AND VENUE

4. This Court has diversity jurisdiction over this suit under 28 U.S.C. § 1332, as the parties are citizens of different States and the amount in controversy exceeds $75,000.00.

5. Venue is proper in the United States District Court for the Southern District of Ohio as some or all of the facts giving rise to this Complaint occurred within Franklin County, Ohio, and a substantial part of the events and omissions giving rise the claims herein occurred in this District, as described below.

## FACTS

### GRAHAM FORD'S BUSINESS RELATIONSHIP WITH FORD COMPONENT SALES, LLC, EDI, AND KOSNER

6. In 2009, Graham Ford entered into a business relationship with Ford Component Sales, LLC ("**FCS**"), which allowed Graham Ford to purchase Ford engines and transmissions ("**Powertrain Assemblies**") from FCS.

7. Graham Ford purchased incomplete Powertrain Assemblies from FCS, would complete them as the engine manufacturer, and would then sell the Powertrain Assemblies to end users.

8. Graham Ford used various vendors in completing the engineering, testing, and assembly of its Powertrain Assemblies. Specifically, Graham Ford had a relationship with EControls, LLC ("**EControls**"), which would assist Graham Ford in calibrating and programming Graham Ford's engine control modules.

9. Kosner is a former employee, contractor, or agent of EControls.

10. By virtue of Kosner's position at EControls, Graham Ford would allow Kosner to enter Graham Ford's premises for the purpose of conducting business on behalf of EControls in support of Graham Ford. When Kosner was on Graham Ford's premises, Kosner had access to

business information of Graham Ford, including but not limited to information regarding Graham Ford's business operations, engine design processes, and calibration and programming information. But for Kosner's status as an employee of EControls, Graham Ford would not have allowed Kosner onto its premises and would not have provided Kosner access to any of Graham Ford's business information.

11. EDI is a competitor of Graham Ford and has the same or a substantially similar business relationship to FCS that Graham Ford had with FCS.

12. EDI stood to gain from FCS terminating its relationship with Graham Ford because the termination would essentially eliminate competition for EDI and allow EDI to increase its market reach by narrowing the field of competitors selling FCS Powertrain Assemblies.

**KOSNER JOINS EDI, BUT CONTINUES TO GO TO GRAHAM FORD**

13. At some unknown time, though upon information and belief sometime during early- to mid-2016, Kosner ceased working for EControls and began to work for EDI.

14. Even though Kosner was now working for EDI, Kosner continued to visit Graham Ford's place of business, pretending that he was there on behalf of EControls. If Graham Ford had been aware that Kosner was working for EDI, it would not have allowed Kosner on its premises, let alone have provided Kosner with access to Graham Ford's business information.

15. In or around July of 2016, Graham Ford learned from Larry Maccani of Roush Industries ("**Roush**"), that Kosner was no longer with EControls and was instead working for EDI. As represented by Roush, in or around July of 2016, Kosner contacted Roush regarding the development of a new engine configuration on behalf of EDI. Roush recognized the engine configuration as belonging to Graham Ford, and immediately informed Graham Ford.

3

16. Graham Ford immediately terminated its relationship with Kosner.

### KOSNER AND EDI'S PRESENTATION TO FCS

17. Sometime in late 2016, EDI, through Kosner and one or more of EDI's officers, arranged for a meeting with FCS to discuss Graham Ford (the "**Meeting**").

18. At the Meeting, EDI, through Kosner and one or more of EDI's officers, presented a slideshow presentation (the "**Presentation**") regarding Graham Ford, which contained false, defamatory, misleading, and disparaging information regarding Graham Ford.

19. Below is a true and accurate picture of the first page of the Presentation, containing both EDI's logo and identifying Kosner as the presenter.



20. Below is a true and accurate picture of the second page of the Presentation.



4

11138092 v1

21. The above statements are false, defamatory, and/or misleading, and were made negligently, maliciously, intentionally, and/or were made with reckless disregard as to whether the statements are true, including but not limited to the fact that the proper emissions stickers were attached and Graham Ford properly assembled and certified the engines.

22. The statements are material because they negligently, maliciously, intentionally, and/or recklessly state, imply, and create the impression that Graham Ford was shipping Powertrain Assemblies in violation of the terms of its agreement with FCS and in violation of federal laws regarding the transportation, emission labelling, and assembly of engines.

23. Below are true and accurate pictures of the third and fourth pages of the Presentation.



(Page 3 of Presentation.)

11138092 v1



(Page 4 of Presentation.)

24. The above statements are false. The engines that were shipped had the appropriate emission stickers, and the images embedded in pages 3 and 4 of the Presentation were not labels to be attached by the customer. Instead, these images are from Graham Ford's Engine OEM Manual ("**OEM Manual**") and were illustrative examples in the OEM Manual to help the user identify the location of the actual emissions labels on the engines and to illustrate what the different labels looked like.

25. The above statements are material because they negligently, maliciously, intentionally, and/or recklessly state, imply, and create the impression that Graham Ford was shipping Powertrain Assemblies in violation of the terms of its agreement with FCS and in violation of federal laws regarding the transportation, emission labelling, and assembly of engines.

26. Page 4 of the Presentation is also false, defamatory, and/or misleading by asserting that Graham Ford was using the Ford/FCS logo without authorization or approval, when in fact Graham Ford had such authorization. While the statements are punctuated with dual question marks ("??"), simply adding a question mark to a statement does not preclude it from

6

being defamatory when the substance of the statement, when taken in the overall context, can be reasonably read as a false assertion of fact.

27. These statements / "questions" were likewise material by falsely asserting and portraying that Graham Ford was making unauthorized use of the Ford/FCS logo.

28. Below is a true and accurate picture of the fifth page of the Presentation:

> **Graham Power Shipped a Full Truck Load of Unassembled Ford 5.4L and 6.8L to H F Hauff Co. in Yakima WA. - June 2016**
>
> Truck Load Shipped on Friday in June 2016 by Graham Power Products Columbus OH as witnessed by Jerry Kosner.
>
> Ford Engines Shipped Unassembled by Graham Power Products: No Emissions Components, no Emissions Stickers Attached and no Testing of the Engines.
>
> Customer H F Hauff Co Yakima WA 509-248-0318: H F Hauff Required to Secure Emissions Components, Assemble Engines, Test Engines and Apply Emissions Stickers.

29. The above statements are false, defamatory, and/or misleading, and were made negligently, maliciously, intentionally, and/or were made with reckless disregard as to whether the statements are true, including but not limited to the fact that proper emissions stickers were attached and the engines were never introduced into interstate commerce.

30. The statements are material because they negligently, maliciously, intentionally, and/or recklessly state, imply, and create the impression that Graham Ford was shipping Powertrain Assemblies in violation of the terms of its agreement with FCS and in violation of federal laws regarding the transportation, emission labelling, and assembly of engines.

31. Page 5 of the Presentation states that this incident was "witnessed by Jerry Kosner" in June 2016. Upon information and belief, Kosner was employed by EDI by this time. As such, Kosner gained access to Graham Ford's premises under false pretenses by representing that he was still employed by EControls, or by negligently or fraudulently failing to disclosure

that he was no longer with EControls and was now working for EDI as Graham Ford's competitor, when there was a duty to disclose such information.

32. Below is a true and accurate picture of the sixth page of the Presentation:

> **Northern Power Becomes the Contracted Upfitter for Graham Power Products 6.8L. Aug 2016**
>
> **19 August 2016:** Graham Power Products will no longer purchase engines from Ford, assemble any engines, test and apply emissions stickers to the certified 2.5L, 5.4L or 6.8L. Northern Power purchases all Graham Power 6.8L Engines.
>
> **Graham Power Prevents Ford Control of Engine Purchases:** Graham Power now avoids the Ford PMP Process Completely on Engine Purchases and Ford has no control of after purchase shipments or market pricing.
>
> **6.8L Purchase Price:** Graham Power is able to buy from Northern Power at the same pricing as Northern OEMs MTU and Cummins at 200-300 engines / yr.

33. The above statements are false, defamatory, and/or misleading, and were made negligently, maliciously, intentionally, and/or were made with reckless disregard as to whether the statements are true, including but not limited to the fact that Graham Ford took no unauthorized action to try and circumvent the FCS sales process, that Graham Ford did not stop assembling engines, and that Graham Ford did not stop applying emissions stickers to its engines.

34. The statements are material because they negligently, maliciously, intentionally, and/or recklessly state, imply, and create the impression that Graham Ford was shipping Powertrain Assemblies in violation of the terms of its agreement with FCS and in violation of federal laws regarding the transportation, emission labelling, and assembly of engines.

35. Below is a true and accurate picture of the seventh page of the Presentation:

8

> **(6) ECMs Shipped from Graham Power Products Customer HF Hauff had Cummins Calibrations Loaded. Nov 2015**
>
> While At Econtrols in Nov 2015, Jerry Kosner picked up (6) GCP 1068 ECMs from Graham Power Products from HF Hauff Co. to Reset for Re-Programming. Upon set up for Re-programming these (6) ECMs had Northern Power Cummins Calibration Loaded Inside. Re-Programming and Return was not completed by Econtrols. The (6) ECMs remain at Econtrols.

36. The above statements are false, defamatory, and/or misleading, and were made negligently, maliciously, intentionally, and/or were made with reckless disregard as to whether the statements are true, including but not limited to the fact "Cummins Calibration" was the default configuration on all ECMs (engine control modules) Graham Ford obtained from EControls, that configuration was not the result of any action taken by Graham Ford, and that the reason Graham Ford returned the ECMs to EControls was because they were defective.

37. The statements are material because they negligently, maliciously, intentionally, and/or recklessly state, imply, and create the impression that, *inter alia*, Graham Ford was improperly using the intellectual property, programming, and engine calibrations of Cummins, another customer of FCS, and that EControls did not return the ECMs to Graham Ford out of some concern that Graham Ford was engaging in inappropriate behavior (when in fact, the ECMs were not returned to Graham Ford because they were defective).

38. Below is a true and accurate picture of the eighth and final page of the Presentation:

9

11138092 v1



39. The above statements are false, defamatory, and/or misleading, and were made negligently, maliciously, intentionally, and/or were made with reckless disregard as to whether the statements are true, and create the impression that Graham Ford was selling Powertrain Assemblies to customers while permitting the customers to be Manufacturer of Record ("**MOR**").

40. The statements are material because they negligently, maliciously, intentionally, and/or recklessly state, imply, and create the impression that Graham Ford was violating its agreement with FCS and federal laws regarding, *inter alia*, the transportation, sales, and introduction of engines into interstate commerce.

41. Overall, the Presentation contained numerous false and misleading statements regarding Graham Power's business, Graham Power's compliance with its agreement with FCS, and Graham Power's compliance with federal laws regarding the transportation, labeling, and introduction of engines into interstate commerce. *See* 40 C.F.R. Part 1068, Subpart B.

42. Defendants knew that the statements in the Presentation, and related statements made during the Meeting, were false, misleading, and defamatory, and Defendants acted negligently, recklessly, maliciously, intentionally, and/or with willful disregard as to whether the statements were true, and disparaged the goods, services, and business of Graham Ford.

10

43. Some of the false or misleading statements made in the Presentation were also premised on what Kosner allegedly saw on Graham's premises, which occurred solely as a result of Kosner's unauthorized access to Graham Ford based on the false pretense that he was still an employee of EControls at the time.

44. Defendants engaged in the above described conduct for the purpose of interfering with Graham Ford's relationship with FCS, from which Defendants stood to directly benefit.

45. After the Presentation, on May 2, 2017, FCS terminated its relationship with Graham Ford.

46. Graham Ford had an uninterrupted business relationship with FCS dating back to at least 2009, at least eight years before FCS terminated its relationship with Graham Ford.

47. Graham Ford engaged in no other action or inaction that would have resulted in FCS's termination of its relationship with Graham Ford. The only occurrence proximate with FCS's termination of its relationship with Graham Ford was Defendants' Presentation.

## COUNT I

### TORTIOUS INTERFERENCE WITH CONTRACT / BUSINESS RELATIONSHIP BY DEFENDANTS

48. Plaintiff incorporates all of the preceding allegations as if fully rewritten herein.

49. Since 2009 at the latest, Graham Ford had a contractual and/or business relationship with FCS.

50. Defendants had knowledge of Graham Ford's contractual and/or business relationship with FCS.

51. Defendants intentionally interfered with Graham Ford's relationship with FCS through wrongful means, including but not limited to false, misleading, and defamatory

11

information in the Presentation, and disparagement of Graham Ford's business, leading to a termination of the relationship between Graham Ford and FCS.

52. Graham Ford has been damaged by Defendants' tortious interference with its relationship with FCS, and is entitled to any and all actual damages stemming from that interference, including but not limited to pecuniary loss through lost business development resources, lost opportunities, and lost profits, in an amount to be determined at trial.

53. Defendants' interference was done intentionally, willfully, and/or recklessly, further entitling Plaintiff to punitive damages and an award of attorneys' fees.

## COUNT II

## DEFAMATION

54. Graham Ford incorporates all of the preceding allegations as if fully rewritten.

55. The statements made by Defendants in the Presentation and Meeting were false and defamatory, were about Graham Ford, and were published without privilege to FCS.

56. Defendants' statements in the Presentation and Meeting were made negligently, recklessly, maliciously, intentionally, and/or with willful disregard as to whether the statements were true.

57. The statements disparaged the goods, services, and business of Graham Ford, and tended to injure Graham Ford's trade or occupation at its principal place of business, and are therefore defamatory *per se*, for which Graham Ford need not prove special damages. Nonetheless, Graham Ford did suffer damages in fact, including but not limited to the termination of its relationship with FCS, lost profits, wasted prior business development, and impairment of reputation.

## COUNT III

### VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT, O.R.C. § 4165.01, *et seq.* ("DTPA")

58. Graham Ford incorporates all of the preceding allegations as if fully rewritten.

59. The DTPA provides, in pertinent part, that a person "engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following …. Disparages the goods, services, or business of another by false representation of fact." O.R.C. § 4165.02(A)(10).

60. Defendants are "persons" under the DTPA.

61. Defendants are competitors of Graham Ford both in terms of their respective relationships with FCS and in the marketplace.

62. In the course of Defendants' business, vocation, or occupation in competing with Graham Ford, Defendants disparaged the goods, services, and business of Graham Ford through false representations of fact described above in the Presentation, in the Meeting, as well as at other times.

63. Graham Ford suffered harm at its principal place of business as a result of Defendants' conduct through the resulting termination of its relationship with FCS.

64. Graham Ford is entitled to injunctive relief, actual damages, and attorneys' fees pursuant to O.R.C. § 4165.03.

## COUNT IV

### CIVIL TRESPASS

65. Graham Ford incorporates all of the preceding allegations as if fully rewritten.

66. Graham Ford's business is located in Grove City, Franklin County, Ohio.

13

67. Graham Ford permitted Kosner to enter its premises as an agent of EControls and for the purpose of furthering Graham Ford's business.

68. Kosner committed an unauthorized intentional act by entering upon Graham Ford's premises under the false pretense by falsely representing that he was an employee of EControls, when in fact Kosner was working for EDI.

69. Alternatively, Kosner negligently, willfully, recklessly, and/or intentionally failed to disclose, when there was a duty to disclose, that he was no longer worked for EControls, but instead was working for EDI as Graham Ford's competitor, when he entered Graham Ford's premises.

70. If Graham Ford had been aware that Kosner was not working for EControls, but was instead working for Graham Ford's competitor EDI, Graham Ford would not have allowed Kosner to enter its premises.

71. Through his unauthorized entry upon Graham Ford's premises as a hidden agent of EDI, Kosner gained unauthorized access to Graham Ford's business, including information regarding Graham Ford's shipments, customers, computers and other electronic devices that had proprietary engine programming and configurations, and other business information. Indeed, as described above, Kosner's unlawful entry upon Graham Ford's premises, and what he claimed to see while on the premises, formed part of the Presentation.

72. Upon information and belief, Kosner was employed by EDI at the same time of his unlawful entry upon Graham Ford's premises, and took such acts to further EDI's business and as part of their strategy to try and sabotage Graham Ford's relationship with FCS, such that EDI is directly and/or vicariously liable for Kosner's conduct.

14

73. As a result of Defendants' conduct, Graham Ford is entitled to nominal damages, actual damages, punitive damages, and attorneys' fees.

## COUNT V

## FRAUD / MISREPRESENTATION

74. Graham Ford incorporates all of the preceding allegations as if fully rewritten.

75. After Kosner was terminated from EControls, and in order to continue to obtain access to Graham Ford's premises on behalf of EDI, Kosner falsely represented to Graham Ford that he was still employed by EControls. Alternatively, Kosner had a duty to disclose that he was no longer employed by EControls, and negligently, knowingly, willfully, and/or intentionally concealed that fact from Graham Ford.

76. Kosner's statements were made falsely, with knowledge of their falsity, or with such utter disregard and reckless as to whether the statements were true or false that knowledge may be inferred.

77. Kosner's false statements and/or failure to disclosure were made with the intent of misleading Graham Ford into relying on it, and Graham Ford justifiably relied upon Kosner's representation or concealments in providing Kosner with continued access to Graham Ford's premises.

78. Graham Ford suffered injury proximately caused by its reliance, including but not limited to Kosner's continued access to Graham Ford's private business operations and the supposed items that Kosner witnessed while on Graham Fords premises, which later served as the basis for his false and defamatory statements made during the Meeting and in the Presentation with FCS.

79.     Upon information and belief, Kosner was employed by EDI at the same of his unlawful entry upon Graham Ford's premises, and took such acts to further EDI's business and as part of their strategy to try and sabotage Graham Ford's relationship with FCS, such that EDI is directly and/or vicariously liable for Kosner's conduct.

80.     As a result of Defendants' conduct, Graham Ford is entitled to actual damages, punitive damages, and attorneys' fees.

**WHEREFORE**, Plaintiff prays for the following relief:

A.     Injunctive relief;

B.     Actual damages, in an amount to be determined at trial;

C.     Punitive damages, in an amount to be determined at trial;

D.     Attorney's fees, expenses, and costs of this action;

E.     Pre- and post-judgment interest as provided by law; and

F.     Such other relief as the Court deems just and proper.


Respectfully submitted,

*s/ David M. Krueger*
DAVID M. KRUEGER (0085072)
**BENESCH FRIEDLANDER**
**COPLAN & ARONOFF LLP**
200 Public Square, Suite 2300
Cleveland, Ohio 44114-2378
Telephone:  (216) 363-4500
Facsimile:   (216) 363-4588
E-mail:        dkrueger@beneschlaw.com

*Attorneys for Plaintiff*

11138092 v1

## JURY DEMAND

Plaintiff hereby demands a trial by jury, on all the issues so triable, by the maximum number of jurors permitted by law.

 *s/ David M. Krueger*
One of Plaintiff's Attorneys

11138092 v1