IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Wallake Power System, LLC,

    Plaintiff,

v.

Engine Distributors, Inc. and Jerry Kosner,

    Defendants.

Case No: 2:18-cv-423

Judge Graham

Magistrate Judge Deavers

Opinion and Order

Plaintiff Wallake Power System, LLC, which does business as Graham Ford, Inc. and Graham Power Products (referred to herein as "Graham Ford" or "Graham"), brings this suit for defamation and tortious interference with a contract. Graham Ford alleges that defendant Engine Distributors, Inc. ("EDI"), one of its competitors in the business of outfitting and selling Ford engines and transmissions, made false accusations that Graham Ford had violated federal emissions laws. Graham Ford contends that EDI purposefully communicated its accusations to engine supplier Ford Component Sales, LLC ("FCS"), which then terminated its supply contract with Graham Ford.

This matter is before the court on defendants' motion for summary judgment. EDI argues that the statements it made to FCS were not false and were not what caused FCS to terminate its relationship with Graham Ford. For the reasons state below, the motion for summary judgment is denied.

I.     Background

    A.     **Graham Ford and the Defendants**

Graham Ford is a limited liability company organized under the laws of Ohio and having its principle place of business in Ohio. Beginning in 2009, Graham Ford entered into a business relationship with FCS whereby Graham Ford purchased incomplete engines and transmissions from FCS. Graham Ford would then complete the powertrain assemblies and sell them to end users, largely in the oil and gas industry. See Krajicek Dep. at 16.

Graham Ford worked with various vendors to assist it in the work of outfitting the powertrain assemblies. One such vendor was EControls, LLC, which specialized in calibrating and programming engine control modules.

1

Defendant Jerry Kosner, a resident of Illinois, was employed by EControls from November 2014 to March 2016. Kosner regularly visited Graham Ford's premises for EControls and became familiar with Graham's business and had access to information about its operations and clients. Graham did not have a non-disclosure agreement with EControls or Kosner.

In May 2016, Kosner began working for defendant EDI, a New Jersey corporation with its principal place of business in New Jersey. EDI also purchased incomplete powertrain assemblies from FCS. Though EDI and Graham were competitors, the annual volume of purchases that EDI made from FCS ($10 million) far outweighed Graham's volume ($125,000 to $250,000). See Krajicek Dep. at 17.

### B. Kosner's August 20, 2016 Email to FCS

On Saturday, August 20, 2016, Kosner emailed Glenn Cummins, the Vice President of EDI, asking him to review a proposed email that Kosner wanted to send to Thad Bostwick, FCS's Executive Director of Sales. See Doc. 39-10. The proposed email stated that Graham Ford was "in direct violation" of 40 C.F.R. § 90.740, an Environmental Protection Agency rule regarding the control of emissions from nonroad spark-ignition engines. Kosner claimed to have personal knowledge of the EPA violations by virtue of his past experience dealing with Graham. He cited purported instances in which Graham had shipped engines without assembling emissions components, conducting emissions testing or applying emissions certifications or stickers to the engines. For example, Kosner cited Graham's delivery of engines to American Industrial Engines ("AIE") "without any of the assembly, emissions parts, and testing." Id. The email concluded, "We bring these non[-]compliant activities to your attention to stop this sales and shipment activity . . . . These activities degrade the Ford Component Sales Brand and must be stopped immediately . . . . [W]e will continue to escalate our activity until this sales channel is shut down." Id.

Whether Kosner intended to do so or not, it turned out that he had copied Bostwick on the August 20 email to Cummins. Bostwick testified that he found the manner in which Kosner's accusations were sent to him to be "concerning." Bostwick Dep. at 22. Bostwick would have expected such accusations to have been communicated by EDI to him through a "senior level executive" and not a salesman like Kosner. Id. at 22-23. Even so, Bostwick suspected that Kosner did in fact intend to send the email to him. See id. at 23.

On Monday, August 22, Bostwick emailed Cummins directly and said, "Glenn – not sure [of] EDI's intent but I find language below [referring to Kosner's email] highly concerning. Suggest you contact me and help me understand EDI's direction." Doc. 39-10. At the same time, Bostwick

requested that Robert Krajicek, who was FCS's account manager on the Graham Ford account, provide him with FCS's sales history with Graham. Id. at 23-24. Bostwick also asked Krajicek to investigate the merits of Kosner's accusations. See Krajicek Dep. at 30.

Cummins responded to Bostwick later on August 22 and stated that Kosner's email "was to simply notify FCS" of Graham's "abuse of selling Ford engines and hurting EDI/FCS reputation in the market." Doc. 39-11. Cummins emphasized that EDI had "worked extremely hard" to cultivate "the Ford product," doing so "while following rules and regulations." Id. Cummins then referenced a PowerPoint file, relating to Kosner's accusations against Graham, which Cummins thought FCS knew about and wanted to review. Cummins expressed his gratitude to FCS for taking the issue seriously and expressed that he wanted FCS to be aware of how Graham's actions were "damaging" to "the success [of] EDI and FCS." Id.

Bostwick responded to Cummins and said he did not know about the PowerPoint file. Id. Bostwick further stated to Cummins that he had talked to Kosner and "told him I was highly concerned with how he was going about this and suggested a broader conversation around his accusations to sort out the facts before considering any actions." Id.

C.     **Kosner's PowerPoint Slides Sent to FCS**

On August 27, 2016, Kosner emailed a PowerPoint file to Bostwick and copied Cummins. Kosner suggested that EDI and FCS meet to discuss the issues raised in the PowerPoint file "for better understanding and improving our competitive position in the marketplace." Doc. 39-12 at PAGEID 812.

The PowerPoint presentation had Kosner's name on it as the author and had a date of August 25, 2016. The presentation contained eight slides, three of which (Slides 2, 3 and 4) are at issue in this lawsuit.[1] Slide 2 stated that Graham had shipped an engine to AIE in November 2015 "without Emissions Components and Emissions Stickers attached." Doc. 39-12 at PAGEID 814. It further stated that it took 5 months for AIE to receive all of the emissions components and that AIE itself had to assemble the engine.

---

[1]  The complaint alleged that seven of the eight slides were false and defamatory. However, in response to defendants' motion for summary judgment, plaintiff concedes that discovery has shown that FCS ultimately disregarded Slides 5 and 7 (because FCS concluded that the accusations in these slides were false) and disregarded Slides 6 and 8 (because FCS believed that the accusations in these slides were immaterial, whether true or not).

3

Slide 3 stated that AIE received emissions stickers or labels from Graham with instructions for AIE to attach the stickers itself. Doc. 39-12 at PAGEID 815. Slide 3 contained two images of the emissions stickers and noted that one related to a "continuous duty natural gas, wellhead gas or propane" engine and the other related to an "emergency duty natural gas" engine. Id.

Slide 4 similarly stated that AIE received emissions stickers or labels from Graham with instructions for the customer to attach the stickers. Doc. 39-12 at PAEID 816. The slide contained an image of an emissions sticker and noted that it related to an "emergency duty natural gas" engine. Id.

Kosner proposed in his email that EDI and FCS use a previously scheduled meeting in September as an opportunity to discuss the PowerPoint slides.

After receiving the email with the PowerPoint slides, Bostwick emailed Krajicek with the instruction "to pull everyone on this email together to review this material and devise a course of action with EDI." Doc. 39-17.

**D. The Meeting between FCS and EDI and Their Ensuing Communications**

FCS and EDI met on September 19, 2016. According to Jaime Cummins, an EDI representative who attended the meeting, one of the topics discussed was EDI's accusations against Graham Ford. See J. Cummins Dep. at 31. FCS and EDI reviewed the PowerPoint slides, and FCS indicated that it wanted to gather facts concerning whether Graham "was selling illegal engines." Id. at 32.

According to meeting minutes prepared by Krajicek, another item discussed was "well/gas head engines." Doc. 39-9 at PAGEID 802. He listed this item under EDI's "current business, opportunities, industry developments." Id.

According to the deposition of Glenn Cummins, another EDI representative, FCS "had communicated to [EDI] that they wanted us to present facts to them" about the accusations. G. Cummins Dep. at 35. In an effort to follow up with FCS "as discussed," Kosner emailed FCS an updated version of his PowerPoint on September 24, 2016. Doc. 39-26; G. Cummins Dep. at 43. The update included pictures of the serial numbers of three purported non-compliant engines Graham shipped to AIE from 2012 to 2016.

On October 11, Kosner emailed Krajicek and informed him that "as discussed at our last Ford meeting," EDI would have physically in its possession two engines that EDI claimed Graham had unlawfully shipped to AIE. Doc. 39-18. Kosner said that the engines "were found unfit for purpose" and were brought to EDI for reconfiguration. Id. Kosner provided contact information for AIE and

4

offered to get copies of the purchase orders for the engines and make the engines available to FCS for inspection.

### E. FCS's Investigation of the Accusations

Shortly after FCS received the initial August 20 email from Kosner, Bostwick instructed Krajicek to investigate the merits of Kosner's accusations. See Krajicek Dep. at 30. In addition to receiving the communications and information described above, Krajicek contacted Roush Industries, an engineering firm which had business relationships with both FCS and Graham. Maccani Decl. at ¶¶ 2-6.

Beginning in September 2016, Krajicek discussed EDI's accusations against Graham with Lawrence Maccani of Roush. Id. at ¶ 6. Maccani told Krajicek that he had assisted Graham with obtaining EPA certification for its engines and that he "believed that EDI's allegations that Graham Ford was engaging in illegal conduct were false." Id. at ¶ 8. Maccani emailed to Krajicek copies of purportedly valid emission certifications for Graham engines.[2] Krajicek Dep. at 57-58.

On October 12, Krajicek forwarded Kosner's October 11 email (offering to give FCS access to two examples of allegedly noncompliant engines) to two other managers at FCS and remarked that he had spoken to Kosner. Doc. 39-18. Krajicek stated that he had told Kosner that FCS did not need access to the AIE engines but "may request photos." Id. Bostwick sent an internal email on October 17 stating, "Unless there is a clear strategy with Graham, I do not want to sell him any more engines . . . ." Id.

Sometime in October, Krajicek and Maccani again discussed the accusations and Krajicek told Maccani that he believed "FCS was going to terminate Graham Ford." Macccani Decl. at ¶ 9.

Around October 18, Krajicek prepared an internal memo for Bostwick and sales manager Jim Rader. The memo listed the accusations against Graham, along with Krajicek's perceived "counterpoints."[3] Doc. 39-14; Krajicek Dep. at 60-61. With respect to the accusation that Graham Ford had "shipped engines without emissions stickers to [AIE]," Krajicek noted as a counterpoint that "Graham does have valid 2016 certs." Doc. 39-14. Krajicek proposed "[n]ot selling to Graham" as a potential response by FCS. Id.

---

[2] It is not clear whether the certifications supplied by Maccani (copies of which are not in the record) corresponded precisely to the engines which Kosner had alleged were put into service unlawfully. When asked about that in his deposition, Krajicek described the certifications as generally addressing the "topic" of the allegations. Krajicek Dep. at 57-58.

[3] Again, EDI's accusations were more numerous than what is now at issue in this suit.

5

Around October 20, Krajicek obtained a copy of FCS's sales agreement with Graham. He sent an email to Bostwick and Rader in which he observed that the agreement could be canceled "with or without reason" and advising that "we have a quick and easy out." Doc. 39-19.

On October 20, Krajicek prepared a signed termination letter giving notice that FCS would be terminating its sales agreement with Graham. Doc. 39-20. However, FCS did not send the letter to Graham. Krajicek Dep. at 66-67.

On October 21 and 23, Krajicek exchanged communications with FCS's in-house legal counsel about Graham. Doc. 39-21; Krajicek Dep. at 67.

On the morning of October 25, Krajicek emailed Rader and sales director Matthew Markley (but not Bostwick) and expressed concern about FCS's "low volume accounts," of which Graham was one. Doc. 39-22; Krajicek Dep. at 68. The email also stated that Graham had a "history of emissions violations beyond what we recently heard about." Doc. 39-22. Krajicek testified that he was referring to an incident from 2013 in which Graham prepared engines without emissions labels because it thought the customer would be exporting the engines outside of the United States. Krajicek Dep. at 70. The customer instead placed the uncertified engines in United States commerce, and it took Graham about a year-and-a-half to resolve the issue. Id. at 70.

Krajicek concluded his email to Rader and Markley by recommending that the contract with Graham be terminated "without further review," a conclusion that he believed Rader supported. Doc. 39-22. Krajicek admitted in his deposition that this was the first time in which FCS had raised low sales volume as a concern with respect to Graham. Krajicek Dep. at 69.

FCS viewed EDI's emissions accusations as concerning insofar as Graham had placed engines into actual use or service without proper certification. Id. at 51. In Krajicek's view, his examination of EDI's accusations showed the "potential that there were legitimate issues in the current situation that we simply hadn't uncovered yet" because he "wasn't an expert in emissions law." Id. at 73-74. Krajicek was concerned about the "possibility" of undiscovered noncompliance by Graham. Id. at 74.

**F.    FCS's Termination of Graham Ford's Contract**

On October 23, Bostwick emailed Krajicek saying that FCS should meet with Chris Wallake, President of Graham Ford, before creating an "exit plan." Doc. 39-23. In the evening of October 25, Krajicek emailed Bostwick stating that he had spoken with Wallake earlier that day about Graham's sales, business model and anticipated near-term orders from FCS. Id. Krajicek recommended to Bostwick that FCS not terminate the contract "unless we want to eliminate possible 2017 sales." Id.

6

Krajicek further recommended that FCS give Wallake "a strong reminder that any hint of emissions impropriety will result in immediate cancellation." Id.

On October 28, Krajicek sent an email to Bostwick and others at FCS in which he summarized a meeting held earlier that day. Doc. 39-24. The email stated that "Thad [Bostwick] directs to cancel Graham Sales Agreement . . . by year end." Id. Krajicek noted that this would require sending the 30-day termination notice by the end of November.

FCS attempted to set up a meeting with Wallake, but the meeting did not take place until February 2, 2017. In an email sent December 1, 2016, Krajicek advised Wallake that FCS needed to conduct a business review of Graham Ford. Doc. 39-25. FCS wanted to discuss Graham's business model, plans for emission certifications in 2017, sales forecasts, markets and physical facility.

Krajicek testified that FCS treated the February 2, 2017 meeting with Wallake as "a legitimate meeting" in which FCS would give him a chance to prove that Graham should have a "continued relationship" with FCS. Krajicek Dep. at 92. "It was Chris' opportunity to demonstrate that he had a valid plan to increase his sales volume." Id. at 93.

According to Krajicek, at the meeting Wallake came across as "disorganized and rambling." Krajicek Dep. at 92. According to Bostwick, Wallake lacked "clear direction" and failed to provide "documentation" of his business plans. Bostwick Dep. at 49.

At the end of the meeting, Bostwick told Wallake that FCS would be terminating Graham's contract. Bostwick testified that his reasons for terminating the contract were Wallake's and Graham's "lack of corporate structure, lack of financial documentation regarding his business," their "low volume" of purchases from FCS, lack of a "clear business plan," and "inability to grow the business." Bostwick Dep. at 41.

According to Wallake, Bostwick went out of his way to disclaim that EDI's accusations played a part in the termination decision. "Out of the blue, he come up and said that 'I'm not terminating you because of that.'" Doc. 28-2 at PAGEID 203. Bostwick denies that he ever mentioned EDI's accusations during the meeting with Wallake. Bostwick Dep. at 49-50.

FCS sent a formal termination letter to Graham on May 2, 2017. Doc. 28-14.

### G. Procedural History

Graham brought this action against EDI and Kosner, asserting five causes of action: tortious interference with a contract; defamation; violations of the Ohio Deceptive Trade Practices Act, O.R.C.§ 4165.01, civil trespass, and fraud. Graham has since stipulated to the dismissal with prejudice

7

of the claims for civil trespass and fraud. Defendants now move for summary judgment on the remaining claims.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

8

**III.    Discussion**

Defendants' motion for summary judgment presents two arguments, each of which attack elements they believe are common to plaintiff's remaining claims. First, defendants argue that their accusations about Graham were not false or deceptive. Second, defendants argue that the statements were not what caused FCS to terminate its relationship with Graham.

**A.    False or Deceptive Statements**

Graham alleges that defendants made false statements to FCS about Graham violating federal emissions laws, which in turn caused FCS to terminate its supply contract with Graham. The accusations were made in series of communications. First, Kosner's August 20, 2016 email to FCS's Bostwick claimed that Graham had been "in direct violation" of an EPA regulation. Then, on August 22, Cummins emailed Bostwick and contrasted Graham's conduct with EDI's, whom he touted as "following rules and regulations" with regard to the EPA. Kosner emailed the PowerPoint slides to FCS on August 27. The slides contained the name of one of Graham's customers (AIE) who allegedly received engines shipped without the required emissions components or certifications. The slides also provided information about the types of engines and emissions stickers at issue. Representatives of EDI and FCS met on September 19, and among the items they discussed was Graham's sale of "illegal engines." Kosner followed up the meeting with his September 24 email to FCS providing pictures of the serial numbers of three engines he claimed were non-compliant. In October, EDI offered to have available for FCS's inspection two examples of "unfit" engines shipped by Graham to AIE.

A "false statement of fact" made by the defendant is an essential element of a defamation claim. Am. Chem. Soc'y v. Leadscope, Inc., 133 Ohio St.3d 366, 389, 978 N.E.2d 832, 852 (Ohio 2012). And where a tortious interference claim is premised upon the defendant allegedly making defamatory statements, the claim will fail if the statements are not defamatory. See Smith v. Nat'l W. Life, 2017-Ohio-4184, ¶ 13, 92 N.E.3d 169, 173 (Ohio Ct. App. 2017) (citing cases). Finally, the Ohio Deceptive Trade Practices Act imposes liability on a person who has, in the course of his business or vocation, "disparaged the goods, services, or business of another by false representation of fact." O.R.C. § 4165.02(A)(10).

Much of defendants' motion for summary judgment was directed at statements (in PowerPoint Slides 5 to 8) which Graham conceded in its response brief are not actionable. What remains are statements about Graham's emissions violations and, in particular, its alleged shipping of engines without proper emissions components and certifications. Defendants' position on these statements is that they were "not verified one way or the other" and so "could be true." Doc. 28-2 at p. 20.

9

The record currently contains little evidence by which to evaluate whether EDI's accusations were true. But defendants' argument that the accusations of emissions violations "could be true" falls well short of satisfying their burden on summary judgment. Defendants must demonstrate that there is no genuine dispute of fact to cast doubt on the truth of the statements. Rather doing so, defendants actually point to evidence which suggests a possibility that the accusations were false. Krajicek, who conducted FCS's investigation into EDI's allegations against Graham, testified that he was unable to verify the truth of EDI's allegation that Graham had sold engines to AIE without proper emissions certifications. See Krajicek Dep. at 50.

Other evidence on the record would, when viewed in a light favorable to plaintiff, also support Graham's assertion that EDI's accusations were false. Maccani submitted a declaration that he believed Graham had obtained "necessary EPA certifications" for the engines it shipped. See Maccani Decl. at ¶ 8. Wallake submitted a declaration stating that Graham has never been in violation of EPA regulations with respect to the shipping and labeling of engines. See Wallake Decl. at ¶ 4. Moreover, with respect to Slides 3 and 4 (which purported to contain images of the emissions stickers that Graham had allegedly sent to AIE to attach on its own), Graham has submitted evidence showing that the images were not of those stickers at all, but instead were images taken from a Ford engine manual. See Doc. 39-15 at p. 5; Doc. 39-16 at p. 5.

In sum, the court finds that defendants have failed to meet their burden at summary judgment of showing that the alleged defamatory statements were true.

### B. Causation

Defendants also argue that FCS terminated its engine supply contract with Graham for reasons other than the accusations EDI made about Graham's emissions violations. Defendants contend that FCS based its decision on Graham's low sales volume, inability to grow the business, lack of a business plan, lack of corporate structure and failure to provide financial documentation regarding its business.

Causation of injury is an element common to claims of defamation *per quod*, tortious interference, and violations of the ODTPA. See Am. Chem. Soc'y, 133 Ohio St.3d at 389, 978 N.E.2d at 852 (element of defamation claim is "injury as a proximate result of the publication"); Fred Siegel Co., L.P.A. v. Arter & Hadden, 85 Ohio St. 3d 171, 176, 707 N.E.2d 853, 858 (Ohio 1999) (element of a tortious interference claim is "resulting damages"); Blankenship v. CFMOTO Powersports, Inc., 161 Ohio Misc. 2d 5, 11, 944 N.E.2d 769, 773 (Ohio Ct. C.P. 2011) (requiring in an ODTPA case proof of "actual losses suffered by the plaintiff").

10

It must be noted, however, that Graham expressly pleaded defamation *per se* in its Amended Complaint. See Doc. 9 at ¶ 60. Claims of defamation *per se* are reserved for certain categories of statements which are recognized to cause such harm that plaintiff need not prove special damages because they are presumed. Ne. Ohio Elite Gymnastics Training Ctr., Inc. v. Osborne, 183 Ohio App.3d 104, 109, 916 N.E.2d 484, 488 (Ohio Ct. App. 2009). Among the categories are words which "tend to injure a person in his trade or occupation." Wagner v. Circle W. Mastiffs, 732 F.Supp.2d 792, 804 (S.D. Ohio 2010) (citing Ohio cases); see also Kanjuka v. MetroHealth Med. Ctr., 151 Ohio App.3d 183, 192, 783 N.E.2d 920, 927 (Ohio Ct. App. 2002) ("An allegation that one has acted unprofessionally constitutes defamation per se.").

Graham has shown that the defamatory statements tended to injure Graham in its trade. In particular, the statements accused Graham of violating federal engine emissions laws in the course of its business of outfitting and shipping engines to its customers. EDI accused Graham of selling "illegal" and "unfit" engines. Defendants have not made any attempt to demonstrate why the statements should not be considered as defamatory *per se*. The court will therefore treat Graham's claim as one for defamation *per se*, and causation of injury is presumed.

In any event, the court further finds that Graham has created a genuine dispute of material fact on the issue of causation. Defendants rely on the deposition testimony of Bostwick, who testified that when he received Kosner's PowerPoint slides, he was not personally alarmed by them because he thought that they were unverified and incomplete. See Bostwick Dep. at 31. Bostwick further cited a number of reasons, unrelated to EDI's accusations, for why FCS terminated its contract with Graham.

In response, Graham has submitted evidence which, when viewed favorably to plaintiff, would support inferences contrary to Bostwick's testimony. On the issue of FCS's reaction to the accusations, there is evidence that FCS treated them seriously. Bostwick sent an email to Cummins saying that he found Kosner's August 20 email "highly concerning." Though one plausible interpretation is that Bostwick meant that he was concerned by how Kosner presented his accusations, another plausible interpretation is that Bostwick was concerned by the accusations themselves. Bostwick was sufficiently concerned that he instructed Krajicek to investigate the accusations. And after receiving the PowerPoint slides a week later, Bostwick told Krajicek to pull the sales team together "to review this material and devise a course of action." Doc. 39-17. FCS met with EDI on September to discuss Graham selling "illegal engines," and Kosner followed up, "as discussed," by

11

providing images of serial numbers to engines that were allegedly non-compliant with EPA regulations. See J. Cummins Dep. at 32; Doc. 39-26.

On the issue of whether FCS, upon having investigated the accusations, viewed the alleged emissions violations as material to its relationship with Graham, here too there is evidence that FCS did. At the end of an email string about EDI making two engines prepared by Graham available for FCS's inspection, Bostwick told Krajicek and the sales team, "I do not want to sell him [Graham] any more engines." Doc. 39-18. Krajicek told Maccani, who had provided FCS with information about Graham's emissions certifications, that he believed "FCS was going to terminate Graham Ford." Maccani Decl. at ¶ 9. Krajicek communicated this same impression to the sales team and even drafted a termination letter to send to Graham. See Docs. 39-20, 39-22. Krajicek encouraged Bostwick that "not selling to Graham" was a viable option since the sales agreement could be canceled "with or without reason," giving FCS "a quick and easy out." Docs. 39-14, 39-19. Finally, Krajicek testified that even though FCS could not verify the emissions allegations one way or another, FCS was concerned by them because of the "potential that there were legitimate issues in the current situation that we simply hadn't uncovered yet." Krajicek Dep. at 73.

The level of concern that FCS showed for the accusations matched what EDI expected FCS's reaction to be. Kosner anticipated that FCS could be moved to shut Graham down as a sales channel because Graham's EPA violations "degrade[d] the Ford Component Sales Brand" and had to be "stopped immediately." Doc. 39-10. Cummins expected FCS to take the accusations seriously because Graham's failure to follow the law was "hurting" FCS's reputation and "damaging" its success. Doc. 39-11.

Defendants argue that the evidence from August through October 2016 concerning FCS's reaction to the accusations and its readiness to terminate Graham's contract should be put aside. Defendants emphasize that despite FCS's posture in October 2016, FCS ultimately gave Graham an opportunity to preserve its supply relationship with FCS, but Graham failed to provide the business plans and documents required by FCS. These are the real reasons, defendants argue, why FCS terminated the contract with Graham in May 2017.

The court finds that there is sufficient evidence from which a jury could reasonably find that FCS's conduct in giving Graham an extra opportunity was pretextual. For one, FCS seemed determined to terminate the relationship – with the termination letter already prepared – until Krajicek communicated with FCS's in-house legal counsel about Graham in late October. Again viewing the evidence in favor of the plaintiff, FCS backed off from terminating the contract following its receipt

of legal advice and suddenly became concerned with issues that it had not raised before, like Graham being a "low volume account" and the emissions incident from three years earlier which Graham had rectified. See Doc. 39-22.

Bostwick faulted Wallake for not providing certain of Graham's financial or business documents at the February 2, 2017 meeting. But a factfinder could reasonably interpret FCS's December 1, 2016 email to Wallake as not requiring him to bring specific documents. See Doc. 39-25. The email identified areas for discussion and did not expressly instruct Wallake to bring specific documents with him.

Finally, Wallake found it odd and telling, and a jury could too, that Bostwick went out of his way at the February 2 meeting to disclaim that defendants' accusations were the real reason why FCS terminated Graham's contract.

In sum, the court finds that there are genuine issues of material fact as to what caused FCS to terminate its contract with Graham.

### IV. Conclusion

Accordingly, defendants' motion for summary judgment (doc. 28) is DENIED.

s/ James L. Graham  
JAMES L. GRAHAM  
United States District Judge

DATE: October 30, 2019