IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Wallake Power System, LLC,   Case No: 2:18-cv-423

    Plaintiff,   Judge Graham

v.

Engine Distributors, Inc. and Jerry Kosner,

    Defendants.

<u>Opinion and Order</u>

I.

Plaintiff Wallake Power System, LLC, d/b/a Graham Ford, Inc., brought this diversity action against defendants Engine Distributors, Inc. (EDI) and Jerry Kosner for defamation, tortious interference with a business relationship, and a violation of the Ohio Deceptive Trade Practices Act.

The first stage of a bifurcated jury trial was held from December 9 to December 12, 2019. In the first stage, the jury found in favor of plaintiff on all three claims on the issue of liability. The case then proceeded to a damages stage. Plaintiff first called Chris Wallake, the owner and of sole proprietor of Graham Ford, as a fact witness. After Mr. Wallake's examination, plaintiff indicated that it would offer no other lay witnesses and was prepared to call its damages expert, Glenn Sheets.

At that point, on December 13, the Court conducted a *Daubert* hearing. Defendants had filed a pretrial motion to exclude Mr. Sheets from testifying at trial on the ground that his opinions would not be supported by the facts in the record. The Court had reserved a ruling on the motion until plaintiff had offered into evidence at trial all facts in support of its claim for damages. During the hearing, counsel for both parties were afforded to opportunity to examine Mr. Sheets. Additionally, the Court posed numerous questions of Mr. Sheets. The parties submitted legal arguments on the matter through pretrial briefs.

Upon full consideration of the parties' arguments, the applicable law, the evidentiary record developed at trial, and the proffered testimony and Report of Mr. Sheets, the Court GRANTS defendants' motion to exclude the testimony of Mr. Sheets. As discussed below, the Court concludes that the opinions of Mr. Sheets lack a foundation in the factual record and that his methodology does not reliably fit the facts of the case.

1

## II.

The trial court serves as a gatekeeper to ensure that expert testimony is both reliable and relevant. Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that the trial court must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. This gatekeeping obligation applies to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)

An expert opinion must be grounded in a reliable method and procedure. It must be "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. The "[p]roposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Id.*

Rule 702 additionally requires that the testimony assist the trier of fact "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The issue of "fit" is "not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S at 591.

When faced with the proffer of expert testimony, the trial court "must determine whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592 (footnote omitted). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93. "[T]he proponent of the testimony that must establish its admissibility by a preponderance of proof." *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

2

III.

"An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000). "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). *See also Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 679 (6th Cir. 2011) (excluding expert opinion which was based on "pure conjecture").

Excluding expert testimony is not a measure this Court takes lightly. If there are mere inconsistencies in the factual record, such that the factual basis of an expert witness' opinion is weak, this bears "on the weight of the evidence rather than on its admissibility." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir.1993). Nonetheless, expert testimony should serve "as a guide to interpreting market facts . . . not a substitute for them." *Brooke Grp.*, 509 U.S. at 242. *See also Davison v. Cole Sewell Corp.*, 231 Fed. App'x 444, 449 (6th Cir. 2007) (excluding expert opinion that "lacked a reliable foundation"); *Shaw v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990) (excluding expert opinion based on assumptions having "no support in the record.").

IV.

In forming his opinions, Mr. Sheets states that he relied on: the pleadings filed in this case; statements made by Mr. Wallake in his deposition testimony, as well as statements made by Mr. Wallake during his testimony on damages on December 12, 2019 and in interviews conducted by Mr. Sheets; financial and tax statements pertaining to Graham Ford, Mr. Wallake and a related-party entity called Lake Kan, LLC; select other documents produced during discovery, including a December 31, 2015 business plan and a listing of transactions which Graham Ford had with Roush Industries; and Mr. Sheets's own research, including a "2014 Capital Markets Report" published by Dr. Craig R. Everett of Pepperdine University and a "QED Report on Venture Capital Financial Analysis" published by James L. Plummer in 1987.

A.

Mr. Sheets testified, and his Report is in accord, that research and development costs incurred by Graham Ford were a primary factor in his damage analysis. R&D expenditures served as his starting point. *See* Dec. 13, 2019 Rough Trial Transcript at 14-15; Sheets Report at ¶ 25. Based on a review of Graham Ford's financial and tax documents, Mr. Sheets determined that Graham had expended

$1,389,469 on research and development from 2011 through 2017. *See* Sheets Report, Ex. C, Sch. 2. Slightly more than $1 million of that amount was expended by Lake Kan, an entity which Mr. Sheets described as having been established by Mr. Wallake to fund Graham Ford's R&D expenditures.

Based on the evidence offered at trial, the Court's understanding of these R&D expenditures is that they related largely to the development of a 6.8L wellhead gas engine product that Graham hoped to bring to market, but also to a 5.4L engine line that Ford discontinued but could be transitioned into a 6.2L product line and also to a 2.5L engine product line that Graham wanted to develop for wood chippers, generators, and sewer cleaner pumps. *See* Trial Exhibits P18, P54. The costs incurred for developing these product lines included creating and testing prototypes, tooling and calibrations, EPA emissions compliance and certifications (for which Graham paid Roush to perform the work), the acquisition of a new building meant to accommodate Graham's anticipated expanding business, and the accompanying costs for improving and maintaining the building.

The Court pauses the narrative here to note at least three concerns with items included by Mr. Sheets in the pot of R&D expenses, even though these concerns may not necessarily be reasons to exclude his testimony wholesale. First, Lake Kan is a business entity that is not a party to this lawsuit. According to the financial documents and the testimony given by Mr. Wallake and Mr. Sheets, Lake Kan expended $1 million of the roughly $1.4 million total spent on R&D costs. *See* Sheets Report, Ex. C, Sch. 2. Plaintiff's damages model factors in the amounts incurred directly by Lake Kan on Graham Ford's behalf. The Court is uncertain – though it need not resolve this issue – whether Lake Kan should be treated as: (a) an investor whose alleged losses from Graham's demise cannot be considered in this suit for damages proximately caused to Graham by the wrongful business conduct committed by defendants EDI and Kosner, or (b) a sole proprietorship whose identity is essentially indistinguishable from Mr. Wallake and his other sole proprietorship, Wallake Powers System d/b/a Graham Ford, and whose alleged losses should be counted as the same as Graham's.

Second, it seems Mr. Sheets included all of Graham Ford's payments to Roush from 2011 to 2016 as R&D costs. *See* Dec. 13, 2019 Rough Tr. at 9; Dec. 12, 2019 Rough Tr. at 16; Ex. P08. This comes despite evidence that Graham relied on Roush during the 2012 to 2014 time-frame to help retrofit a significant number of engines (at least 28 units according to Mr. Wallake, *see* Doc. 63 at PAGEID1385) for EPA compliance and certification, because those engines had been meant for export but were put into use in the United States. The Court finds that plaintiff has not established that the costs expended to rectify the emissions issue with the engines meant for export represent a true R&D expense. *See* Dec. 9, 2019 Rough Tr. at 43-45 (Mr. Wallake explaining the steps taken to

4

rectify the problem). Given the lack of evidence establishing how much money Graham spent to rectify the issue, the Court further finds that plaintiff has failed to demonstrate precisely how much money it expended with Roush on legitimate R&D costs.

Third, Mr. Sheets appears to have included normal business operating costs in the R&D pot. *See* Dec. 13, 2019 Rough Tr. at 22-24. Not only was Graham preparing for new product lines,[1] it was operating an existing business which included sales of engines to HF Hauff for use in wind machines in agriculture and sales of Ford parts nationwide to a base of about 6000 customers. In other words, the R&D cost tally captured regular business expenses which happened to have been incurred in the same time-frame in which Graham was developing new products. Mr. Sheets included costs like bathroom supplies and building security in his calculations even though they almost surely should not be fully allocated to the products in development.[2] The Court finds that these normal operating costs cannot be considered as R&D expenses. And here too plaintiff has failed to establish exactly how much of the purported R&D expenditures are not normal operating costs.

B.

Mr. Sheets, with his calculation of $1.4 million in R&D expenses in hand, then examined documents created by Graham Ford in 2015 and entitled "Business Objectives" and "Business Plan." *See* Exs. P18, P54. These documents reflected sky-high expectations for markets Graham had not yet entered. They projected annual engine sales to go from a few hundred units (a number which Graham had been selling at best) to 14,400 units in a span of 5 years or so. They expected annual sales of $145 million in the same span, up from the $1 to $2 million Graham had been doing. To support the exponential growth, Graham would need 28 employees; this despite the fact that Mr. Wallake had largely operated the business alone or with one employee who retired at some point or with the occasional assistance of one his sons.

---

[1] The anticipated 6.8L wellhead gas engine line was the predominant focus of the evidence and argument about Graham's expected growth. To the extent the Court discusses the issues in terms of the wellhead gas engine line, it does so not in an effort to ignore Graham's other anticipated products but in an effort to accurately reflect both the record at trial and plaintiff's claims and theories of recovery.

[2] The Court must further note the evidence that Graham Ford was not the only tenant of the facility owned by Graham. There was testimony and photographic evidence that a recreational vehicle sales business operated out of the building. *See* Dec. 9. 2019 Rough Tr. at 70; Ex. P25. There is no indication on the record that expenses related to the operation of the other business tenant were excluded from the R&D calculation.

5

Mr. Sheets candidly testified that Graham's expectations needed a "sanity check." *See* Dec. 13, 2019 Rough Tr. at 67. But, as will be explained in detail below, the sanity check he performed was not the type the Court would find to be reliable, based in the factual record and useful to the trier of fact in calculating actual damages caused by defendants' conduct.

Mr. Sheets treated Graham Ford not as a business which sustained actual lost profits when defendants' disparaging statements caused Ford Component Sales (FCS) to end its engine supply relationship with Graham. Rather, he treated Graham (together with Mr. Wallake and Lake Kan) as a venture capitalist. He viewed the $1.4 million in R&D expenses as investment money to support a future business opportunity. *See* Sheets Report at ¶ 30 ("These expenditures represent an investment by [Graham Ford] undertaken in contemplation of future business opportunities."). In support of that approach, Mr. Sheets looked to the optimistic projections from the 2015 documents, as well as an August 2014 email by Roush representative Larry Maccani (who testified in the liability stage of trial) in which he stated to a FCS executive that Graham's 6.8L wellhead engine project and its 5.4L project represented "new areas of opportunity where Ford is currently not doing business." *See* Ex. P19.

This approach mirrors the testimony regarding damages that plaintiff's counsel elicited from Mr. Wallake, who testified that in order to fund the R&D costs, he and his wife pulled money out of other investments and out of savings and borrowed against their house. Mr. Wallake effectively threw his resources into the investment opportunity he saw in the wellhead gas engine market. He wanted a return on his investment and specifically noted during his testimony that funding the R&D costs caused him to lose about 8% interest on the money he pulled out of investments and to pay 8% on the loans he took out. *See* Dec. 12, 2019 Rough Tr. at 17.

Timing-wise, Mr. Wallake had figured that by 2017 the investment phase would be behind him and he would start to realize some of the growth and return anticipated in the 2015 plans. *See* Dec. 12, 2019 Rough Tr. at 23; Sheets Report at ¶ 40 (calling the R&D expenditures "a one-time investment"). As it turned out, the first half of 2017 was when FCS terminated the engine supply relationship with Graham. But plaintiff does not seek compensation for actual lost engine sales with existing customers (perhaps because there is evidence of none, as discussed below). Instead, plaintiff seeks to recover the value of the perceived lost investment.

Tellingly, the studies and literature[3] cited by Mr. Sheets in his Report concern the "required rates of return" that lenders such as "venture capital firms" and "angel investors" demand for "extending capital in today's economic environment." *See* 2014 Capital Markets Report at p. 7. They relate to seed money, the various life stages of startup companies, and the mathematical calculation of an "internal rate of return" (or "IRR") that venture capitalists expect as a "performance goal" on their investments. *See* QED Report on Venture Capital Financial Analysis at p. 1-14.

Mr. Sheets thus viewed damages through the lens of venture capitalist. And his damages model assumes that the investment would have been a good one. *See* Dec. 13, 2019 Rough Tr. at 55. His damages calculations ensure that Graham would "recover the investment in the R&D expenses." *See* Sheets Report at ¶ 30. He further analyzed "future cash flows that would have been reasonably expected[,] provided a minimum level of return on the R&D related investment." *See id.* at ¶ 36.

This is where Mr. Sheets performed his version of a "sanity check" – instead of assuming that Mr. Wallake would have expected the double-digit percentage IRR that most venture capitalists do, Mr. Sheets assumed that Mr. Wallake would have "required" a "conservative" IRR of 8%. *See id.* at ¶ 45. Perhaps not surprisingly, this percentage matches the 8% rate that Wallake cited as what it cost him to move money out of investments and to take out loans.

Applying an 8% IRR, Mr. Sheets calculated Graham's economic damages from May 2, 2017 (the time of FCS's termination of the relationship) through 2023 (when Mr. Wallake expected to retire at about age 70) to be $2,556,880. The calculations by which Mr. Sheets arrived at the final number are contained in Exhibit C to his Report.

C.

The Court finds that the testimony and Report of Mr. Sheets lacks a basis in the factual record and that his methodology does not reliably fit this case. To start, plaintiff did not bring this case alleging that the actions of defendants defrauded it out of an investment. It is not the facts of this case, for instance, that plaintiff invested seed money with defendants, who then made off with the funds.

Plainly, this is a business dispute over disparaging statements made by defendants which caused FCS to cease supplying engines to Graham Ford. Ohio law allows for compensation for injury

---

[3] These materials were provided to the Court by Mr. Sheets during the *Daubert* hearing, and the Court has reviewed the materials in considering defendants' motion to preclude his testimony.

to reputation, a type of injury for which plaintiff and its expert have offered no evidence. *See Lansdowne v. Beacon Journal Pub. Co.*, 32 Ohio St. 3d 176, 180, 512 N.E.2d 979, 983 (1987).

Ohio law also allows for recovery of lost profits that plaintiff can prove by a preponderance of the evidence were reasonably certain. *See Harris v. Univ. Hosps. of Cleveland*, 2002-Ohio-983, 2002 WL 363593 at *8 (Ohio Ct. App. March 7, 2002) (citing *Kinetico, Inc. v. Independent Ohio Nail Co.*, 19 Ohio App.3d 26, 30, 482 N.E.2d 1345, 1350 (1984)); *Endersby v. Schneppe*, 73 Ohio App. 3d 212, 216–17, 596 N.E.2d 1081, 1084 (1991) ("Proof of lost profits must be reasonably certain and may not be speculative. Where conclusory evidence of lost profits is presented, without supporting information explaining how the profits were calculated, there is insufficient evidence of such lost profits.").

Mr. Sheets calculated lost return on what he treated as an investment; he did not calculate lost business profits. *See* Sheets Report at ¶¶ 28, 58 ("[Graham] has lost the opportunity to recover its investment in the R&D activities . . . ."). However, as the Report of defendants' expert Charles Lunden highlights, Generally Accepted Accounting Principles treat funds put into R&D as expenses, not investments.

> At the time most research and development costs are incurred, the future benefits are at best uncertain. In other words, there is no indication that an economic resource has been created. . . . Although future benefits from a particular research and development project may be foreseen, they generally cannot be measured *with a reasonable degree of certainty*. . . . Research and development costs therefore fail to satisfy the suggested measurability test for accounting recognition as an asset.

Lunden Report at ¶ 2 (quoting Generally Accepted Accounting Principles, Topic 730-10-05-2) (emphasis added).

Mr. Sheets readily admitted in his testimony that his analysis did not identify a single lost customer. *See* Dec.13, 2019 Rough Tr. at 44. In focusing on a perceived lost investment, his calculations and opinion have become disconnected to the facts in the record. For instance, Mr. Sheets assumed in his Report and testimony that the termination of the supply contract with FCS caused Graham Ford to cease operations – that Graham had no economically viable source of engines to keep it operating. *See* Sheets Report at ¶ 28; Dec. 13, 2019 Rough Tr. at 56. Mr. Sheets testified that Mr. Wallake told him that, though he could get engines from Northern Power Products (NPP), he would effectively be "borrowing" from NPP and would have to replace those engines with ones Graham bought from FCS. *See id.* at 56-57.

This factual assumption that Graham had to get its engines from FCS to continue operations is wholly contradicted by the evidence developed at trial. Graham's actual business operations

8

depended on a "strategic partnership" with NPP (and Roush), whereby Graham acquired its engine supply from NPP. *See* Ex. P20. Though Graham had a supply contract in place with FCS, the contract did not obligate Graham to purchase a certain number of engines or generate a certain amount of sales volume. *See* Joint Ex. IV. It is undisputed that Graham was a "low volume" customer for FCS, and indeed Mr. Wallake testified that the last time he had ordered engines from FCS was in January 2016. *See* Dec. 12, 2019 Rough Tr. at 47.

Mr. Wallake testified that he got all the engines he needed from NPP for his then-existing business. *See* Dec. 10, 2019 Rough Tr. at 7. He preferred dealing with NPP because they had a shorter lead time in supplying the engines and he could buy in smaller quantities than he could from FCS. *See* Dec. 9, 2019 Rough Tr. at 41-42. The actual business operations with respect to engines had two aspects in late 2016 and in early 2017, when the underlying wrongful conduct occurred and caused the termination of the supply contract. First, Graham sold wind machine engines to HF Hauff. Second, Graham had sold 20 wellhead gas engines, 16 or 18 of which he had sourced from NPP. *See* Dec. 12, 2019 Rough Tr. at 48. Mr. Wallake testified that the termination of the FCS relationship had no impact on his ability to get engines from NPP and did not hinder his ability to meet demand for wind machine engines. *See* Dec. 10, 2019 Rough Tr. at 66-67; Dec. 12, 2019 Rough Tr. at 58. In recorded statements that Mr. Wallake made to FCS executives during a February 2, 2017 meeting, he represented that he got his wind machine engines to his satisfaction from NPP. *See* Dec. 11, 2019 Rough Tr. at 31-32. Mr. Maccani of Roush, the third part of the strategic partnership, testified that he was unaware of any limit on the number of engines that Graham could get from NPP. *See* Dec. 11, 2019 Rough Tr. at 65-66.

It is clear that Mr. Wallake believed, and Mr. Sheets assumed, that the termination of the FCS relationship spelled the end of what Mr. Wallake hoped Graham Ford could become, not what it actually was at the time of termination. Based on the perceived investment Graham had made and the expectation that it would be a successful investment, particularly in the wellhead gas engine area, Mr. Sheets assumed that Graham would be selling engines in such a volume (many thousands) that no one other than FCS could supply the demand. *See* Dec. 13, 2019 Rough Tr. at 56.

This hope and assumption has not been established with a reasonably certainty. It runs on the fumes of Mr. Maccani's 2014 statement that wellhead gas engines represented an area of opportunity and Mr. Wallake's observation that the wellhead engine prototypes and testing were promising. Plaintiff never did enter some of the other markets indicated in its 2015 Business Objectives and 2015 Business Plan. *See* Dec. 12, 2019 Rough Tr. at 59-60. And with respect to the

wellhead engine line, plaintiff has failed to offer evidence of a single existing order for a wellhead engine at the time FCS terminated the contract, let alone provide evidence of a volume of orders on the magnitude that it would have required a supply from FCS.

Absent from the Report of Mr. Sheets is the type of market analysis that the Court would expect to find in support of the assertion that the wellhead engine business likely would be resoundingly successful for Graham. *See Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.*, 530 Fed. App'x 542, 550 (6th Cir. 2013) (market study used to reliably establish that geographic area could have supported two Ford vehicle dealerships rather than one). Mr. Sheets opines that based on the R&D expenditures alone, the 8% IRR would have "required" Graham to enjoy 46% annual revenue growth. *See* Sheets Report at ¶ 46. But Mr. Sheet has not performed or pointed to a study that would supply relevant information on the nature of the wellhead gas engine market from 2017 to 2023 or of the other markets Graham had hoped to enter. There is no data concerning the number of customers who buy wellhead engines, the number of units sold to that market, the pricing and profit margins, the number of competitors that Graham Ford would have faced or the ease of penetration for a new entrant like Graham.[4] It would be only from a rigorous analysis of the market that plaintiff, in the absence of proof of actual lost customers or contracts, could establish with reasonable certainty what its profits would have been. This lack of market study and analysis in plaintiff's case comes with some irony, for the literature relied on by Mr. Sheets advises that "the market studies must look good enough" before a reasonable venture capitalist will jump on board. *See* QED Report on Venture Capital Financial Analysis at p. 1-12.

Yet even if plaintiff could have established with reasonable certainty the parameters of the wellhead gas engine market, Mr. Sheets does not supply a reliable opinion that Graham Ford in particular would have had the financial wherewithal to have made it into the market. Yes, Graham had developed the 6.8L product and obtained EPA certification in late 2015. Graham did expend significant sums of money, about $500,000 by Mr. Wallake's estimate, to get to that point. *See* Dec. 12, 2019 Rough Tr. at 19-20. However, Mr. Sheets does not account for the facts demonstrating clear obstacles to future success.

According to Mr. Wallake's tax returns and his testimony, Graham had not made a profit since 2011 and sales had declined from $2 million in 2012 to under $1 million in 2016. *See* Exs. P09-P17;

---

[4] In contrast, defendants' expert relies, for instance, on oil and gas market studies conducted by the United States Energy Administration concerning the number of active rigs in a given year. *See* Lunden Report at ¶ 5.

Doc. 48-2 at PAGEID1019. Graham had a major cash shortage and no confirmed investors. *See* Docs. 48-9, 48-10 (showing a cash balance of $53,000 at the end of 2015 and $13,000 at the end of 2016); Wallake Dep. at 193-195 (testifying about his search for investors). Further, Mr. Kosner testified that Mr. Wallake told him in April 2016 that Graham had lost its credit status with FCS in December 2015 and was put on a COD basis. *See* Dec. 10, 2019 Rough Tr. at 92-94. This testimony was consistent with Mr. Wallake's own testimony concerning his credit status with FCS. *See* Dec. 9, 2019 Rough Tr. at 41-42. In short, the Court finds that the failure of Mr. Sheets to account for these important facts renders his opinion regarding plaintiff's lost future returns unreliable.

V.

The Court finds that plaintiff has not met its burden of establishing the admissibility of Mr. Sheets's testimony and opinions under Rule 702. Accordingly, defendants' motion to exclude the testimony of plaintiff's damages expert (doc. 48) is GRANTED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: December 16, 2019