IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Wallake Power System, LLC, | Case No: 2:18-cv-423 |
| Plaintiff, | Judge Graham |
| v. | Magistrate Judge Deavers |
| Engine Distributors, Inc. and Jerry Kosner, | |
| Defendants. | |

<u>Opinion and Order</u>

This defamation action went to a jury trial in October 2021 for a determination of the damages that defendants' conduct caused to plaintiff's business. The jury awarded plaintiff $826,822 in lost profits, $173,178 for reputational harm, and $200,000 in punitive damages. On the eve of trial and during trial, defendants filed various motions, including motions in limine and motions for judgment as a matter of law, to preclude plaintiff from offering evidence of lost profits and to exclude engine sales from the scope of plaintiff's "parts" business. The Court denied each of defendants' motions.

This matter is now before the Court on defendants' renewed motion for judgment as a matter of law or, in the alternative, for a new trial. *See* Fed. R. Civ. P. 50(b). Defendants' motion raises two of the same arguments as before – namely, that plaintiff should not have been permitted to introduce evidence of lost profits and that lost engine sales should not have been included within the scope of plaintiff's "parts" business.

For the reasons stated below, defendants' renewed motion for judgment as a matter of law or, in the alternative, for a new trial is denied.

**I.     Background**

    **A.     The First Trial and the Grant of a New Trial on Damages**

Plaintiff, which did business as Graham Ford, brought suit against Engine Distributors, Inc. ("EDI") and EDI's employee Jerry Kosner. Graham Ford alleged that defendants had falsely accused it of not complying with federal emissions regulations with respect to certain engines which Graham had shipped to one of its customers. Defendants made those accusations to Ford Component Sales (FCS), with whom Graham had a Powertrain Sales Agreement.

1

Two jury trials have been conducted. The first trial was held in December 2019, and it was bifurcated. The jury found during the liability stage that defendants made false and defamatory statements to FCS and that the statements caused FCS to terminate the Powertrain Sales Agreement. In the damages stage, Graham focused its presentation on lost business opportunities, which primarily related to a line of assembled, certified powertrains that Graham had been hoping to bring to market in the oil and gas sector. Those powertrains were generally referred to as wellhead gas engines. The Court found as a matter of law that plaintiff's evidence of lost business opportunities was speculative and that plaintiff had failed to prove lost profits or lost business opportunities relating to its plans to sell wellhead gas engines. The Court held that Graham's recovery would be limited to reputational harm and punitive damages.

During closing argument, however, plaintiff's counsel made reference to the loss of Graham's "parts" business and customers, about which the jury had heard little evidence and had no basis to calculate damages. The jury returned a total damages verdict of $1,150,000 for Graham and defendants moved for a new trial on the grounds that the statements made by plaintiff's counsel during closing argument had prejudiced the jury. The Court agreed and granted defendants "a new trial on the issues of compensatory and punitive damages." Doc. 112 at p. 13.

The Court then conducted a telephone conference with the parties concerning the scope of the case and discovery going forward. The Court stated: "I think that it would be good for counsel to just look at this case like it's a brand new case [] regarding the damage to the parts side of the business and start out with interrogatories and requests for production of documents and so forth and then following up with depositions." Doc. 117 at pp. 6-7. The Court issued an Order concerning discovery stating that "discovery in this matter is reopened on the issue of the harm caused by defendants' defamatory conduct to plaintiff's parts business." Doc. 115 at p. 1.

The parties exchanged discovery requests, including interrogatories and document production requests relating to lost profits and the parts business. Doc. 168-1 at pp. 8, 12.

In October 2020, Graham Ford produced to defendants a report from its damages expert, Glenn Sheets, in which plaintiff plainly indicated that at the new trial it intended to seek an award of lost profits suffered by its parts business. Graham repeated its intentions in its final pretrial statement in September 2021. Doc. 138. Throughout, Graham Ford also clearly stated its position that the scope of the "parts" business should include unassembled, uncertified engines and related components which Graham sold to various customers, including H.F. Hauff. *See* Sheets Damages Report (dated Oct. 7, 2020); Docs. 139, 144.

2

### B. Defendants' Prior Motions

At the final pretrial conference held on September 9, 2021, the Court invited the parties to raise any issue or concerns regarding the new trial on damages. Defendants raised none. But on October 11, 2021, the day before trial, defendants filed a motion in limine to exclude any evidence of lost profits and, in particular, any evidence of lost engines sales to H.F. Hauff. Defendants argued that Graham's recovery should be limited to reputational harm and that unassembled engines should not be included in the scope of the parts business.

In a written order, the Court denied defendants' motion in limine. Doc. 150. The Court observed that, in granting a new trial, it had not limited the scope of discovery or the new trial to only reputational harm. The Court had instructed counsel to treat the matter like "a brand new case" regarding "the damage to the parts side of the business." Plaintiff, the Court noted, had clearly stated its intention to seek lost profits suffered by its parts business. Moreover, the Court found under Ohio law that damages for defamation include not only reputational harm but also any lost profits caused by the defamatory conduct. *See id.* at p. 2 (citing cases). The Court concluded that at the new trial Graham could "pursue damages for reputational injury and lost profits proximately caused by FCS terminating the Powertrain Sales Agreement." *Id.* at p. 3.

At the new trial, plaintiff put forth evidence that the termination of the Powertrain Sales Agreement rendered Graham unable to purchase genuine Ford parts, including unassembled engines, from FCS. *See* Transcript of Oct. 12, 2021, at pp. 97–99 (testifying that Graham's account with Ford was shut down). Further, plaintiff produced evidence that Graham could no longer use the Ford name or branding, lost access to technical support, and that its existing stock had to be classified as "surplus" and was more difficult to sell. *Id.* at p. 105. Plaintiff put on evidence of historical sales and profits data from its parts business and presented expert testimony concerning its lost profits. A substantial portion of the alleged lost profits concerned unassembled engine sales to H.F. Hauff.

At several points during the trial, defendants objected to plaintiff's evidence and presentation of the case. For example, while cross-examining Chris Wallake (Graham's owner and president) defendants moved for a mistrial based on plaintiff's introduction of evidence about engine sales. The Court denied the motion, reasoning:

> [T]here was a reference to parts in the final arguments [of the first trial] which led to the Court's granting of a new trial because there wasn't any evidence about parts.

3

> As it turns out, I don't think that that distinction really should undermine the plaintiff's claim for damages. I think it's my strong feeling that the plaintiff should be entitled to recover damages for any and all economic loss and/or loss of reputation arising out of the defamation and arising out of the cancellation of the FCS contract.
>
> And so whether it was parts, in quotes, or engines, in quotes, or some combination thereof, if they were obtained by the plaintiff through the FCS contract which was canceled, then the loss of that business and the loss of the ability to sell those products was a result of the defamatory conduct.
>
> I can't see in the agreement, the FCS agreement, any distinction between parts and engines. And the evidence in this case indicates that whether they were parts or engines or whatever kind of Ford product they were, they were being provided to the plaintiff pursuant to the agreement which was canceled as a result of the defamatory conduct.

Oct. 12, 2021 Tr. at pp. 143–44.

After plaintiff rested its case, defendants renewed their motion for a mistrial, renewed its October 11, 2021 motion in limine, and also moved for judgment as a matter of law. The Court denied those motions, holding that:

> [P]arts may include engine assemblies or partial engine assemblies and that there is no distinction in the Ford supply contract regarding parts and engines. They all came from Ford and the cancellation of the Ford contract resulted in damages to the plaintiff for sale of parts, sale of engines or anything in between.
>
> While the Court in earlier orders referred to parts, it has certainly been clear for about a year that the plaintiff's construction of the contract was that parts included engine assemblies or partial engine assemblies and the defense should have been prepared to address that issue in this trial. The defendants were not prejudiced by having to do so.

Oct. 14, 2021 Tr. at p. 423. The Court further held that plaintiff had produced sufficient evidence from which a jury could find that Graham had suffered lost profits as a result of the termination of the Agreement. *Id.* at pp. 444–45.

At the close of the defendants' case, defendants renewed their motion for a directed verdict or judgment as a matter of law. The Court denied the renewed motion, adhering to its earlier rulings. *Id.* at p. 508.

4

**III.   Standard of Review**

Defendants have filed a post-trial motion for judgment as a matter of law under Rule 50(b), or, in the alternative, for a new trial under Rule 59.

Rule 50 provides that a court may enter judgment against a party when the "party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). "In this Circuit, a federal court sitting in diversity must apply the standard for judgments as a matter of law of the state whose substantive law governs." *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 468 (6th Cir. 1996). Under Ohio law, a court evaluating a Rule 50 motion must construe the evidence "most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied." *Cunningham v. Hildebrand*, 142 Ohio App. 3d 218, 224, 755 N.E.2d 384, 388 (Ohio Ct. App. 2001). When a Rule 50 motion is made, "what is being tested is a question of law; that is, the legal sufficiency of the evidence to take the case to the jury. This does not involve weighing the evidence or trying the credibility of witnesses." *Wagner v. Roche Labs.*, 77 Ohio St. 3d 116, 119, 671 N.E.2d 252, 255 (Ohio 1996).

Rule 59 provides that a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). This standard is met "when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 606 (6th Cir. 2018) (internal quotation marks omitted).

**IV.   Discussion**

   **A.   Scope of the New Trial**

Continuing with what they have previously argued, defendants contend that the scope of the second trial exceeded the legal boundaries of the Court's earlier ruling granting a new trial on damages. Defendants argue that the second trial was meant to be a trial concerning the reputational harm caused to plaintiff's parts business; it was not meant to include consideration of lost profits or anything to do with engines.

5

For reasons already stated on the record in written opinions and rulings from the bench, the Court disagrees. After the first trial, defendants asked for a new trial on damages, and the Court granted their request. The Court did not limit recovery to reputational harm but ordered a "new trial on the issues of compensatory and punitive damages," Doc. 112 at p. 13. The Court instructed the parties to approach the matter as a "brand new case" as to "the damage to the parts side of the business," and it reopened discovery "on the issue of the harm caused by defendants' defamatory conduct to plaintiff's parts business." Doc. 117 at pp. 6-7; Doc. 115 at p. 1.

Under Ohio law plaintiff is entitled to recover the damages caused by defendants' defamatory conduct. Those damages includes more than pure reputational harm – they include the "direct financial losses resulting from the plaintiff's impaired reputation." *Sky v. Van Der Westhuizen*, 2019-Ohio-1960, ¶ 59, 136 N.E.3d 820, 831 (Ohio Ct. App.). "Regarding the type of damages recoverable in a defamation action, the law generally holds that a plaintiff may recover economic losses, which include lost income and loss of earning capacity, where the evidence shows a nexus between the damages and the defamation, and damages also include impairment of reputation, personal humiliation, shame, mental anguish, and suffering." *Mallory v. Ohio Univ.*, 2002-Ohio-7406, ¶ 27, 121 Ohio Misc. 2d 64, 70, 782 N.E.2d 173, 177 (Ohio Ct. Claims) (internal quotation marks omitted).

The jury's verdict as to liability in the first trial established that defendants' defamatory conduct caused FCS to terminate the Powertrain Sales Agreement. Plaintiff therefore was entitled to pursue direct economic losses caused by the termination of the Agreement, as well as impairment to its reputation.

In the first trial, the Court held that plaintiff's theory regarding the alleged loss of business opportunities relating to certified, assembled wellhead gas engines was speculative, and the Court thus limited the first jury's consideration of damages to reputational harm. However, in the second trial, plaintiff offered ample evidence from which the jury could reasonably find and calculate the profits lost when FCS terminated the Agreement and Graham could no longer purchase and resell Ford parts and components.

Defendants take great issue with including "engines" in the scope of Graham's "parts" business. It is true that the Court used those terms in its order granting a new trial on damages. It did so because the evidence developed in the first trial suggested a distinction between Graham's "parts" business and its "industrial engine" business. Dec. 9, 2019 Tr. at 53-54; Dec. 12, 2019 Tr. at 688-89. But in restarting the case the Court did not attempt to limit or define the scope of the parts

6

business. The Court intentionally allowed the discovery process and development of the record at trial to establish the nature of the injuries caused to Graham when FCS terminated the Agreement. The only item of damage excluded in the new trial was lost business opportunities relating to Graham's plans for turnkey industrial engines – those which Graham had fully assembled and certified, particularly the wellhead gas engine line.

Graham put forth more than sufficient evidence at trial to establish that a significant portion of its business was purchasing unassembled engines from FCS and selling them (still unassembled and uncertified) to buyers like H.F. Hauff. *See, e.g.*, Oct. 12, 2021 Tr. at pp. 49–55, 70–80; Oct. 13, 2021 Tr. at pp. 258–63, 300, 302–08; Pl.'s Exs. 65, 74, 125, 127, 149, 152. Contrary to defendants' assertions, nothing in the Court's prior rulings, nothing under Ohio law, and nothing in the Powertrain Sales Agreement precluded Graham from recovering the profits it lost when FCS terminated the Agreement as a result of defendants' defamatory conduct. The jury in the second trial found by a preponderance of the evidence that those lost profits were $826,822. The jury's finding is directly supported by the evidence and the damages calculations of plaintiff's expert. *See* Sheets Damages Report, ¶ 33.

**B.  Objections to Plaintiff's Expert**

Defendants argue that the testimony and damages calculations of plaintiff's expert, Glenn Sheets, was unreliable because it did not account for certain evidence which defendants produced. This evidence included: (1) Graham's failure to turn a profit, as reflected in Wallake's income tax returns, (2) Wallake's statement in an email, predating the termination of the Agreement, that he was planning to exit the parts business, and (3) the possibility that Graham could have mitigated its damages by purchasing engines from Northern Power Products. According to defendants, it was impossible for Graham to have suffered any lost profits when it was not turning a profit to begin with, was planning to exit the business anyway, and could have mitigated its damages in any event.

Defendants' argument ignores the countervailing evidence. Plaintiff produced evidence that Graham did not turn a profit in certain years because of non-recurring research and development expenses related to the wellhead gas engine plans; when excluding those expenses, Graham made a profit on its parts business. Oct. 12, 2021 Tr. at pp. 82–84; Oct. 13, 2021 Tr. at p. 262; Ex. 74. Also, the evidence included Wallake's testimony that his thought of exiting the parts business in 2016 did not come to fruition because he could not strike a deal with the potential buyer. Wallake then continued to operate his business as before and did not plan to retire until 2023. Oct. 12, 2021 Tr. at p. 116; Oct. 13, 2021 Tr. at pp. 248–49. Finally, plaintiff offered the testimony of Graham's

7

financial officer, Dan Bloom, who testified that getting engines from Northern Power was not a viable option because it would have cut too deeply into Graham's profit margins. *Id.* at pp. 267–68.

Sheets' testimony and calculations had a direct foundation in the evidence produced by plaintiff at trial. Sheets made assumptions – such as that Wallake would have kept working until 2023 – based on the testimony of lay witnesses and on Graham's financial records. Defendants are incorrect that Sheets' opinions had to be excluded simply because he did not accept defendants' version of disputed facts. It was for the jury to decide what the facts were and to credit or discredit expert opinion accordingly. Here, the jury heard all of the evidence, including that which supported defendants' arguments that Graham did not have any profits to lose and should have made efforts to mitigate. The jury was free to decide which side to believe, and the Court instructed the jury that they could give Sheets' opinion "such weight as [they] think it deserves" and could "disregard" his opinion if they found that it was "outweighed by other evidence." Oct. 14, 2021 Tr. at p. 575.

Defendants next object to the supplemental portion of Sheets' report and opinion. *See* Sheets Damages Report, ¶¶ 41–42. Sheets' original damages calculation was based on historical sales data and resulted in a lost profits amount of $826,822. Sheets prepared a separate damages calculation in light of the trial testimony of Wallake and Neil Hauff that H.F. Hauff had anticipated buying 250 more engine units per year from Graham than what it had been buying historically. Sheets calculated an additional $1,191,451 in lost profits. Defendants argue that Sheets' supplemental opinion was speculative and contrary to the evidence that Graham could have purchased engines from Northern Power.

The Court finds that Sheet's supplemental opinion was based on the evidence adduced at trial. Oct. 12, 2021 Tr. at p. 79; Oct. 13, 2021 Tr. at pp. 307–10. It was for the jury to decide whether the prospect that H.F. Hauff would have actually made the future purchases was reasonably certain. And, in fact, the jury rejected that portion of plaintiff's case. The jury returned a verdict of lost profits in the amount of $826,822, which was the calculation based solely on historical sales. The jury did not award damages for the alleged lost increased sales to H.F. Hauff, and thus defendants' argument on this issue is moot.

      **C.**    **Objections to the Verdict on Reputational Injury**

The jury awarded plaintiff $173,178 for loss of reputation. Defendants argue that this award is unsupportable because there was no evidence that anyone besides FCS heard the defamatory statements. Defendants also contend that Graham had a poor reputation to start with because of

problems Graham experienced in 2011 relating to engines it had released into the market without proper emissions certifications. Oct. 13, 2021 Tr. at pp. 191–95.

As the Court discussed at length in its order granting a new trial on damages, jury determinations of reputational harm are known to be an area of "unguided" evaluation. Doc. 112 at p. 6 (citing case law). In cases, as here, of defamation *per se*, the United States Supreme Court, Sixth Circuit, and Ohio law all agree that juries may award damages for reputational harm even in the absence of proof "'that such harm actually occurred.'" *Id.* at pp. 3–4 (quoting *Gertz v. Welch*, 418 U.S. 323, 349 (1974) and citing other case law and authorities).

Knowing the difficulty of predicting jury awards for reputational harm and knowing that the first jury had found defendants liable for defamation, defendants asked for a new trial on damages and got one. Plaintiff had no burden to produce proof of an actual loss of reputation. *Gosden v. Louis*, 116 Ohio App. 3d 195, 208–09, 687 N.E.2d 481, 489–90 (Ohio Ct. App. 1996) ("Proof of the defamation itself established the existence of some damages."). On that basis alone, the Court finds defendants' objections to be without merit.

Furthermore, defendants are incorrect that the jury heard no evidence from which to discern a reputational harm. It may be true that FCS alone heard the defamatory statements, but those statements caused Graham to lose its rights under the Agreement, including its ability to associate with the Ford brand. Wallake testified as to the significance of Graham's association with Ford – the Ford name and logo played an important part of Graham's marketing and ability to establish credibility with customers, and doing business was more difficult, if not impossible, without them. Oct. 12, 2021 Tr. at pp. 49–50, 105.

The Court also notes that plaintiff offered rebuttal evidence from which the jury could have found that Graham enjoyed a good reputation in the marketplace. Wallake acknowledged Graham's problems in 2011 but explained that they were due to mistake and that Graham voluntarily corrected the situation. Oct. 13, 2021 Tr. at pp. 191–95, 247. Neil Hauff, whose business was directly affected by the 2011 problems, testified that Graham rebounded to offer a quality of customer service and technical expertise that was "unattainable by anybody else." Oct. 13, 2021 Tr. at p. 301.

In the final analysis, the jury heard all of the evidence and arguments. It was instructed on how to determine reputational injury under Ohio law and reached a verdict indicating that they were not persuaded by defendants and instead believed that defendants' conduct had caused significant reputational harm to Graham. The Court finds no grounds for setting aside the jury's verdict.

**D.** **Liability**

Defendants offer two separate arguments about the liability stage of the first trial – one about its effect on the second trial and one about the sufficiency of the evidence in the first.

As to effect, defendants argue that the Court improperly required the second jury to accept the first jury's verdict in favor of plaintiff on Graham's claim of tortious interference with a business relationship. Defendants argue that since the Court granted defendants' Rule 50 motion as to the tortious interference claim in the first trial, an instruction requiring the second jury to accept findings relating to the dismissed claim was erroneous.

The Court instructed the second jury to accept as proven and true that plaintiff had established the various elements of a defamation claim. This included the first jury's findings that defendants had made false and defamatory statements to FCS and that Graham was injured as a result. Oct. 14, 2021 Tr. at p. 579. Without mentioning the term "tortious interference," the Court also instructed the second jury to accept as proven and true that "FCS terminated the Powertrain Sales Agreement as a result of Defendants' conduct." *Id.* at p. 580.

Defendants' characterization of the Court's Rule 50 dismissal of the tortious interference claim is incomplete. The Court granted the Rule 50 motion during the damages stage of the first trial because the tortious interference claim required proof of actual damages and plaintiff had produced none as it related lost business opportunities for the wellhead gas engines. Dec. 16, 2019 Tr. at p. 878. The Court did not set aside the liability verdict. Essential to the first jury's liability verdict as to the tortious interference claim was a finding that defendants interfered with Graham's business relationship with FCS. Dec. 12, 2019 Tr. at p. 657. Graham's business relationship with FCS was encompassed by the Powertrain Sales Agreement, and it necessarily follows that the first jury found that it was defendants' conduct which caused FCS to terminate the Agreement. Thus, the Court finds that it properly instructed the second jury on the effect of the first jury's findings as to liability.

Turning to the sufficiency of the evidence as to liability in the first trial, defendants argue that "[d]espite the jury's findings, defendants did produce evidence" that the statements they made to FCS were not false and were not material. Doc. 165 at p. 13. Defendants argue that there was ample evidence in the record to have supported a liability verdict in their favor.[1]

---

[1] Plaintiff contests the timeliness of defendants' current challenge to the sufficiency of the evidence in the first trial. Defendants moved under Rule 50(a) for judgment as a matter of law during the first trial. Doc. 99. But plaintiff argues that defendants should have raised the issue in their Rule 50(b)

10

Defendants fall well short of satisfying the applicable standard for insufficiency of the evidence. Defendants argue only that the first jury could have found in their favor, not that "reasonable minds" could not have reached a verdict for plaintiff. *Cunningham*, 142 Ohio App. 3d at 224, 755 N.E.2d at 388; *Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 597 (6th Cir. 2013). The Court must view the evidence at the first trial "most strongly" in plaintiff's favor and readily finds that plaintiff produced substantial evidence to support the liability verdicts in its favor. *Cunningham*, 142 Ohio App. 3d at 224, 755 N.E.2d at 388.

On the point that defendants' accusations that Graham had shipped engines without proper emissions components and certifications were false, plaintiff produced extensive evidence and testimony from Wallake and Larry Maccani of Roush Industries that Graham had fully complied with EPA regulations. *See*, *e.g.*, Pl.'s Exs. 51, 53, 60, 61, 62; Dec. 9, 2019 Tr. at pp. 61–75; Dec. 10, 2019 Tr. at pp. 212–18; Dec. 11, 2019 Tr. at pp. 472–73, 477–81, 494, 500–01.

On the point that defendants' accusations were material to FCS, plaintiff likewise produced much evidence that the accusations "had the potential of causing a lot of issues" and led FCS to react by investigating and indicating that FCS intended to terminate the Powertrain Sales Agreement. *See*, *e.g.*, Dec. 10, 2019 Tr. at pp. 354, 356–57, 362, 385–87; Dec. 11, 2019 Tr. at pp. 466, 481, 494, 519; Joint Exs. VII, XXI, XXII.

### V.  Conclusion

Accordingly, defendants' renewed motion for judgment as a matter of law or, in the alternative, for a new trial (doc. 165) is DENIED in its entirety.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: March 28, 2022

---

motion after the first trial. Because defendants' current challenge fails on the merits, the Court need not resolve whether the challenge is untimely.